IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PANEL SPECIALISTS, INC.,

        Plaintiff/Counterclaim Defendant,

        v.                                  No. 16-4140-SAC

TENAWA HAVEN PROCESSING, LLC.,

        Defendant/Counterclaim Plaintiff.

MEMORANDUM AND ORDER

        This is contractual dispute over the construction of a natural gas processing plant owned by the defendant/counterclaim plaintiff Tenawa Haven, LLC ("Tenawa") for which the plaintiff/counterclaim defendant Panel Specialists, Inc. ("PSI") contracted and performed instrumentation and electrical services. The pending dispositive motions include:  PSI's Motion for Partial Summary Judgment on the Issue of Breach of Contract for Delay (ECF# 100); Tenawa's Motion for Summary Judgment on PSI's Unjust Enrichment/Quantum Meruit Claim (ECF# 102); PSI's Motion for Partial Summary Judgment on Contracts (ECF# 103); Tenawa's Motion for Partial Summary Judgment on Mechanic's Lien Claim (ECF# 106); Tenawa's Motion for Summary Judgment on Attorney's Fees and Interest (ECF# 108); Tenawa's Motion for Partial Summary Judgment to Enforce Plaintiff's Published Price List (ECF# 110); and Tenawa's Motion to Strike PSI's Reply (ECF# 128) and for Leave to file a Sur-Reply (ECF# 130).

**SUMMARY JUDGMENT STANDARDS**

Ultimately, a court grants summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56. But first, the movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. This does not mean the moving party must negate the other side's claims or defenses through affidavits. *Id.* Upon a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings, that is, mere allegations or denials, and set forth specific facts showing a genuine issue of material fact for trial, relying upon the types of evidentiary materials contemplated by Rule 56. *Id.*

A court decides the motion "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). So, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. To be genuine, a factual dispute requires more than a mere scintilla of evidence in support of a party's position. *Id.* at 252. This means that the purpose of Rule 56 "is not

to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). At the same time, the summary judgment stage does not authorize the court's weighing of the evidence, crediting some over other, or determining the truth of disputed matters, but it shall decide whether a genuine issue of material fact for trial exists. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id.* at 657. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**SUMMARY OF UNCONTROVERTED FACTS**

These facts serve as the background for the court's rulings on the pending motions. The court incorporates relevant stipulations and general facts that frame the issues central in the motions. It leaves the facts more specific to the motions for later discussion.

In 2013, Next Generation Processing, LLC ("NGP") decided to build a cryogenic natural gas processing facility in Haven, Kansas, ("Plant") to straddle Panhandle Eastern Pipe Line's interstate pipeline and to serve gas

producers throughout southwest Kansas, northwest Oklahoma, and the Texas Panhandle. NGP solicited investors and Tenawa was created to own and operate this natural gas facility. Greg Ameringer, owner of NGP, acquired an equity interest in Tenawa with its formation.

PSI's business is providing instrumentation and electrical ("I&E") services to the oil and gas industry. PSI's president is Earl Bergeron. He personally performed some of PSI's work for Tenawa in planning and estimating the work and in doing and supervising construction work at the Plant.

In 2012, Mr. Ameringer approached Mr. Bergeron about I&E work for the proposed plant and provided him with information. Working from that, PSI furnished on March 21, 2012, an initial budget estimate for I&E work totaling $6.4 million. PSI revised its estimate in September of 2013 to $4.76 million. Mr. Ameringer requested PSI to provide Tenawa with a letter laying out PSI's scope of work and estimating its price. Mr. Bergeron sent a letter dated December 7, 2013, that estimated PSI's price at $4.76 million and stated in part:

> Please note that the original price of $4,760,000 dated Sept. 13, 2013 was a preliminary budget quote based on the information provided by Tenawa and work performed on similar projects. Panel Specialists Inc. will work on the Haven Project based on a cost-plus basis. Freight and any taxes will also apply to parts and/or equipment sales. I have attached a price list.

ECF# 104-1, p. 8. The attached price list was titled, "Published Price List Field Services," and was dated, "2-1-13." *Id.* at p. 9. The parties' understandings differ over this price list's purpose, effect and operation.

Mr. Ameringer followed up with an email to Mr. Bergeron attaching a purchase order signed and dated December 13, 2013, by Mr. Ameringer. Also attached to this email were Mr. Bergeron's letter of December 7, 2013, PSI's 2-1-13 published price list, the "Panel Scope" spreadsheet dated September 13, 2012, certain I&E design and specification documents, and the Master Service Agreement ("MSA") signed by Mr. Ameringer and also dated December 13, 2013. Mr. Ameringer's email asked PSI to review, sign, and return the MSA. This purchase order for $4.76 million, No. HAV-121313-002, identified PSI as the vendor and described its work as "Cost Plus Proposal for Haven Instrumentation and Electrical Engineering per Panel Specialist Cover Letter and Earlier Budgetary Estimate date 12/7/13." ECF# 104-1, p. 10.

Mr. Bergeron signed the MSA. The parties dispute the meaning, scope and effect of certain provisions in the MSA. The following are some of the provisions in question:

1. **WORK OR SERVICES COVERED**
(a) From time to time during the term hereof, Company [Tenawa], as owner and/or operator of . . . , may request, either orally or in writing, that Contractor [PSI] perform work or render services for the benefit or account of Company. If Contractor agrees to perform such work or services for Company, then, subject to the provisions of Section 20 below which addresses potential conflicts between the terms of "work orders," "service orders," "job or delivery tickets," "invoices," or other

similar form(s) for a particular job and the terms of this Agreement, this agreement shall control and govern the performance of all such work or services and the relationship of the parties relating thereto. . . . . . . .

(c) This Agreement does not grant Contractor an exclusive right or contract to perform all services described in Exhibit I required from time to time by Company, . . . . Neither Company nor Contractor shall be bound by the terms hereof until work or services have been authorized by Company and accepted by Contractor.

## 2.   CONTRACTOR'S OBLIGATIONS

Contractor shall:

(a) Perform all work or services hereunder with due diligence and in a good and workmanlike manner in compliance with the provisions hereof, as well as the provisions of Exhibits I, III and IV here to. . . . . . . . .

## 6.   METHOD AND TIME OF PAYMENT

(a) Contractor shall furnish an invoice to Company in a form satisfactory to Company within thirty (30) days of completion of the work done pursuant hereto. Company shall pay for the work performed hereunder within thirty (30) days after the receipt of such invoices. . . . All invoices shall detail the work done, the equipment or supplies and materials furnished by Contractor for the work, and the rates applicable to each item in accordance with the schedule of rates furnished by Contractor (or with succeeding current rate schedules if approved in writing by Company), or at bid prices where applicable. If an increase in rates is not satisfactory to Company, Company shall have the right to cancel this Agreement by giving Contractor notice to that effect. Contractor shall provide Company not less than thirty (30) days written notice prior to the proposed effective date of changes in said rate schedule. . . . .

. . . .

## 14.   NOTICES AND INQUIRIES

All notices and inquires with regard to this Agreement shall be in writing and shall be delivered either personally to the designated representative of the party being notified or sent by registered mail, return receipt requested, to the address of each party set forth on the signature pages hereof. All notices shall be effective as of the time received by the addressee.

. . . .

**17.** **AMENDMENTS**

This agreement may be amended only by an instrument in writing signed by both parties hereto.

. . . .

**19.** **GOVERNING LAW**

THIS AGREEMENT, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED AND GOVERNED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. . . .

**20.** **ENTIRE AGREEMENT**

This instrument embodies the entire agreement of the parties as to the subject matter hereof. There are no promises, terms, conditions or obligations other than those contained herein. Should the parties hereto enter into any future formal written agreements (excluding any printed or other pre-prepared form(s) of "work orders", "service orders", "job or delivery tickets", "invoices" or other similar form(s) submitted to Company by Contractor) specially prepared to provide for a particular job to be done or service to be rendered by Contractor, then, in the event of a conflict between the terms of such agreement and the terms of this Agreement, the terms of the special agreement for the particular job or services shall prevail. In the event of a conflict between the provisions hereof and the provisions of any printed or other pre-prepared form(s) of "work orders," "service orders," "job or delivery tickets," "invoices," or other similar form(s) submitted to Company by Contractor in connection with any work or services performed hereunder, the provisions of this Agreement shall prevail and be controlling.

. . . .

## EXHIBIT I
## WORK DESCRIPTION AND RATE SCHEDULE

1. Work To Be Performed:

Panel Specialists Inc. will supply labor and materials to install all instrumentation and electrical control systems to ensure proper plant functioning. . . .

2. Rates For Above Work:  (Rates based on attached schedule supplied by Contractor or if a particular work order is bid, the bid price will become the basis for Contractor's compensation.)

Panel Specialists will perform the above described work on a Cost-Plus Basis per Panel Specialists rates included in the Purchase Order. The Preliminary Estimate for Panel Specialist work is **$4,760,000.**

ECF# 104-1, pp. 15-18, 22-23, 30. It is uncontroverted that the parties did not later jointly sign a document to amend pursuant to ¶ 17 above. Nor did the parties pursuant to ¶¶ 6 and 14 provide express written notice of a proposed change in any schedule of rates and receive prior express written approval for a change in any schedule of rates.

On July 3, 2014, Mr. Ameringer for Tenawa emailed Earl Bergeron for PSI asking, "Per our conversation, attached is the Initial Cost Estimate to be updated. Thanks and Have a Great 4th." ECF# 104-1, p. 12. The attachment to this email is titled, "Panel IC Est-9-19-12.pdf." *Id*. Mr. Bergeron responded by email on the morning of July 17, 2014. It reads, "Please review the attached update and call me if you have any questions." *Id.* The attachment to this email is titled, "Panel_Scope_Haven_estimate _33.xls." *Id.* at pp. 12-13. The attachment is a single page that describes ten separate jobs, *e.g.*, "Purchase and Install all Electrical Equip required for the Plant" with an estimated total cost of "2,500,000." *Id.* at p. 14. The attachment does not describe or disclose an estimated amount of work hours and equipment needed for each job. Nor does it describe or disclose the hourly rates or pricing list for the individual work and equipment costs for any of the jobs. PSI's updated estimate, however, increased the total cost of its work to $6.685 million. *Id.* Mr. Ameringer's email reply sent that same afternoon did not seek any clarification but simply said, "Looks good. See you next week." *Id.* at p. 13. No new purchase order issued from

updated estimate. But, PSI's work at the Plant site did not begin until after Tenawa received and approved this updated estimate. This update did not include the cost of PSI's work performed later at the Interconnect Facility.

PSI provided delivery tickets for labor and services provided, including per diems and lodging all of which were approved by Tenawa. Some of PSI's 2014 delivery tickets charged rates for work that were higher than the 2013 price list. PSI says the higher rates are what it was charging in 2014. Tenawa points to delivery tickets beginning in the fall of 2014 that included Mr. Bergeron's work as a programmer being charged at $125 per hour instead of $100 per hour. In the Spring of 2015, Mr. Earl's Bergeron's programming rate increased to $135 per hour, and Mr. Scott Bergeron's technician rate increased from $90 to $100 per hour. Mr. Bergeron's wife, Denise, who was PSI's Finance Manager, Secretary, and Treasurer, testified that notice of these rate changes came in the delivery tickets which Tenawa received and signed.

The court will discuss the remaining facts in its analysis of the motions.

## PSI'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON TENAWA'S BREACH OF CONTRACT FOR DELAY COUNTERCLAIM (ECF# 100)

In its factual contentions in the pretrial order, Tenawa includes that PSI agreed in the MSA to perform its work "in a timely manner," and "with due diligence and in a good and workmanlike manner." ECF# 95, p. 8. Tenawa specifically borrows the language from the MSA in laying out the

9

theory of this claim, "that if, in Tenawa's opinion, PSI fails to use reasonable diligence in performing the Work or fails to perform the Work according to the specifications required by the MSA, Tenawa 'may at its election take over and perform, either through its own employees or another contractor, all or any part of the work then remaining unperformed." *Id.* To support this claim, Tenawa alleges, in part, that PSI's work crew at the Plant site were inexperienced and lacked competent leadership, that PSI did not meet construction deadlines, and that schedules continued to be pushed back causing Tenawa to bring on another I&E contractor, Industrial Electric Company ("IEC") to assist PSI in completing the I&E work. Tenawa concludes its factual allegations with:

> By late March 2015, IEC had taken over the vast majority of PSI's Work (including I&E ordering and installation) and PSI was restricted to programming and limited commissioning work only. By the time that the Plant went into operation on May 15, 2015 (over four months past the original deadline), PSI only had two employees on site, although IEC had a full crew on site until late 2015 to finish up punchlist I&E work.

ECF# 95, p. 10. As for the financial consequences from PSI's delay, Tenawa asserts:

> When PSI left the Plant in May 2015, Tenawa had paid it $5.99 million (a 25.8% overrun from PSI's budgetary estimate letter), even though Tenawa also had to pay IEC another $2.7 Million to complete PSI's scope of work. As mentioned above, IEC's work was expedited and performed on short notice with very tight deadlines because of delays caused by PSI. The expedited nature of IEC's work resulted in Tenawa having to pay IEC roughly 30% more (or approximately $800,000) than that work would have cost on a normal project and without being expedited.

*Id.* Later in the pretrial order, Tenawa includes the following among its legal claims:

> Additionally, the Work provided by PSI failed to satisfy PSI's contractual obligations and breached the terms of its contract with Tenawa because the Work was delayed. This resulted in Tenawa being forced to hire IEC to complete PSI's Work on an expedited basis, which caused approximately $800,000 in increased costs to be paid by Tenawa to IEC that would have been avoided had PSI not fallen behind schedule with its work."

*Id.* at p. 14.

PSI seeks summary judgment arguing Tenawa lacks evidence to prove PSI's work delayed the project. Specifically, the MSA and related documents state no completion dates or time estimates for PSI's work. Tenawa never communicated to PSI a completion date for its work. Tenawa never established a project schedule with work completion dates. Tenawa lacks evidence that PSI's work, as opposed to the work of others, caused any delay. ECF# 101, p. 9. PSI insists Tenawa must prove more than some general delay in PSI's work. It must have evidence that PSI's work delayed the entire construction project's completion and caused financial loss to Tenawa. PSI further asserts Tenawa cannot prove the duration of any delay or consequential damages from any alleged delay.

Tenawa disputes PSI's arguments as irrelevant, because its counterclaim does not seek liquidated damages or lost profits but only the increased costs from paying IEC for expedited work. Tenawa explains its "claim is based on paragraph 10 of the MSA" and asks only for those limited

costs incurred "because Tenawa was not satisfied with PSI's work on the Project from a quality, timeliness or organizational perspective." ECF# 119, at p. 2. Paragraph 10 provides, in part:

> **10.** **FAILURE TO PERFORM**
> Time and quality of work are of the essence of this Agreement. If, in Company's opinion, Contractor should fail at any time during the performance hereof to provide the necessary crews, tools, machinery, equipment or materials of the proper performance of the work herein contracted for, or should breach this Agreement in whole or in part, or fail to use reasonable diligence in the performance hereof, or should not be performing this Agreement in the manner herein provided, or . . ., the Company may at its election take over and perform, either through its own employees or another contractor, all or any part of the work then remaining unperformed. . . . In the event Company takes over work performed or material, equipment, machinery or supplies furnished prior to such taking over until all work required under this agreement is completed and accepted by Company, at which time Company's total costs and expenses in completing this work shall be deducted from the amount which otherwise would have accrued to Contractor and the difference, if any, shall be paid by Company to Contractor.

Tenawa reads ¶ 10 as authorizing its takeover of all or any part of PSI's work if, in its sole opinion, PSI is not providing sufficient crews, is breaching the MSA, is not using reasonable diligence, or is not performing the MSA. Should it takeover PSI's work, Tenewa asserts it "has the right to charge PSI for the increased cost of taking over and performing the work." ECF# 119, p. 2. Tenawa's claim under ¶ 10 is based on PSI's deficient performance in late 2014 that required bringing IEC on site in January of 2015, first only to assist, but later to take over much of PSI's work. IEC charged Tenawa more than what PSI would have charged, because IEC worked on an expedited basis. Since PSI's summary judgment motion overlooks Tenawa's narrowed

counterclaim that seeks relief only under the express terms of ¶ 10 in the MSA, Tenawa concludes PSI is not entitled to summary judgment.

Even if Tenawa's delay counterclaim pursues rights under the MSA's ¶ 10 only, PSI replies that Tenawa still must prove the fact and duration of delay, the fault of delay not being more attributable to Tenawa, and the causal connection between the delay and the additional cost. PSI, however, brings forward no legal authority or persuasive argument for imposing additional elements of proof to enforce the limited contractual remedy. PSI's citation of *Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 131 (Tex. App. 1993), does not support its position. PSI's arguments over Tenawa's insufficient evidence on schedules or commitments governing PSI's work creates a genuine issue of material fact on the reasonableness of PSI's takeover under ¶ 10.

PSI's reply also includes these new arguments. Tenawa did not "takeover" PSI's work. Tenawa did not notify PSI about "electing" to exercise takeover rights under ¶ 10. Tenawa continued to accept PSI's performance under the contract and, therefore, lost "any excuse for ceasing performance on its part." ECF# 124, p. 14 (citing *Balfour Beatty Rail, Inc. v. The Kansas City Southern Railway Co.*, 173 F.Supp.3d 363, 406 (N.D. Tex. 2016)). Tenawa's allegations are overwhelmed by the uncontroverted facts that PSI was not terminated, but completed its work and remains unpaid for some work. These new arguments will not be addressed here. Generally, issues

raised for the first time in a reply brief are not considered with an exception for new issues raised in reply to the respondent's arguments. *In re Gold Resource Corporation Securities* Litigation, 776 F.3d 1103, 1118 (10th Cir. 2015). PSI's new arguments are replies to Tenawa's arguments. But, in its original motion and memorandum, PSI failed to address Tenawa's ¶ 10 delay counterclaim as pleaded in the pretrial order. ECF# 95, p. 8. "The Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance." *Swimwear Solution, Inc. v. Orlando Bathing Suit, LLC*, 309 F. Supp. 3d 1022, 1044 (D. Kan. 2018) (internal quotation marks and citation omitted). Therefore, the court will not consider PSI's new arguments.

Someone could read the pretrial order, like PSI apparently did, and think Tenawa's breach of contract claim for delay asserts more than the exercise of rights and remedies under ¶ 10 in the MSA. Consistent with these summary judgment proceedings, the court strictly interprets Tenawa's only breach of contract counterclaim for PSI's delay as exclusively seeking enforcement of its "takeover" rights under ¶ 10 and the MSA's limited relief, that is, the increased costs and expenses in completing the work.

PSI's summary judgment arguments aim at larger targets than the Tenawa's ¶ 10 counterclaim. Nothing in the MSA supports PSI's position that Tenawa's exercise of "takeover" rights under ¶ 10 is expressly conditioned upon Tenawa proving PSI missed, violated, or breached any

completion dates found in any controlling documents or an established project schedule. Nor has PSI come forward with any legal authority from Texas interpreting a "takeover" provision as generally requiring such proof. Instead, the MSA provides that Tenawa's exercise of ¶ 10 rights is triggered by, "If, in Company's opinion, Contractor should fail . . ., Company may at its election take over and perform . . . ." ECF# 104-1, p. 21. This term certainly confers discretion on Tenawa within the bounds of reasonableness and good faith under the circumstances. *See Anahuac, Inc. v. Wilkes*, 622 S.W.2d 634, 636-37 (Tex. Civ. App. 1981). Tenawa has come forward with affidavits setting forth the opinions which triggered its retention and use of IEC, its declining use of PSI, and its increased costs in paying IEC for expedited work that PSI had been expected to do. Because PSI has not shown the absence of genuine issues of material fact nor shown the evidence to be so one-sided such that it must prevail as a matter of law, the court denies PSI's motion for summary judgment. The court, however, has construed Tenawa's counterclaim for breach of contract for delay as seeking recovery and relief exclusively under the limited terms of MSA's ¶ 10.

**TENAWA'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PSI'S UNJUST ENRICHMENT/QUANTUM MERUIT CLAIM (ECF# 102)**

As set out in the pretrial order, PSI claims:

iii.    Unjust Enrichment/Quantum Meruit:  PSI performed a substantial amount of design and engineering work for the Interconnect Facility that was done at the request of Greg Ameringer. That work was never invoiced, and Tenawa has been unjustly enriched to PSI's detriment. Moreover, for all work performed by PSI that was

not within its original scope, Tenawa has accepted such work, put the Plant to its intended us and has failed to properly compensate PSI.

ECF# 95, p. 12. As for its damages and non-monetary relief, PSI set out in the pretrial order the following:

> PSI claims entitlement to the following damages and monetary relief:
> i. Unpaid contract sums totaling **$498,093.46** in labor, equipment and materials provided to Tenawa, representing amounts set forth in delivery tickets and invoices that were reviewed and approved by Tenawa yet remain unpaid; . . . .

ECF# 95, p. 16. PSI's claimed damages also include the simple interest of $79,097.81 accrued from March 2015 through October 2015 for Tenawa's late payment of $494,361.31, and the simple interest accruing from March 2015 through judgment for the unpaid contract sums "set forth in delivery tickets and invoices." *Id.* PSI does not include in the pretrial order any separate allegation of damages for its unjust enrichment/quantum meruit claim based on "that work [which] was never invoiced." *Id.* at p. 12.

Tenawa argues that throughout discovery PSI's unjust enrichment/quantum meruit ("UEQM") claim was based exclusively on PSI's submitted invoices which were unpaid, and that only in the drafting of the pretrial order, did this claim expand to other work which PSI performed for Tenawa but which it never invoiced. Because the pretrial order includes no additional amount of damages for the work which PSI never invoiced, Tenawa seeks judgment as a matter of law. Tenawa additionally argues this UEQM claim is new and barred by the statute of limitations because it does not relate back to the original filings. Tenawa says it has been prejudiced

16

from not conducting discovery on this new UEQM claim. Finally, highlighting PSI officials' admissions that the MSA governed PSI's work, Tenawa concludes this enforceable contract prevents PSI from recovering on its new UEQM claim.

PSI says it assisted with engineering and planning for the Interconnect Facility, its work was not contemplated or covered as part of the MSA's scope of work, and it billed for only part of its Interconnect Facility work. PSI reveals its UEQM claim responds to Tenawa's recent claim that PSI overbilled for work and service by not using the 2013 published price list. As Mr. Bergeron, PSI's President, reveals in his affidavit, "If Tenawa now wants to renegotiate the value of PSI's work provided to Tenawa, PSI intends to collect for all of the man hours not specifically billed." ECF# 117-1, p. 2, ¶13. PSI compares its expanded UEQM claim to Tenawa "attempting to reduce the amounts it agreed to pay PSI through offsets and claims that PSI 'overbilled' Tenawa for work and service, none of which were raised prior to this Lawsuit." ECF# 117, p. 4, ¶14. PSI denies its expanded UEQM claim is new or has caused any unfair surprise or prejudice to Tenawa. PSI contends its failure to include in the pretrial order an itemized monetary amount of damages for this claim does not preclude going forward and proving the same at trial. Indeed, PSI affirmatively asserts its UEQM damages for Interconnect Facility work is already "included in the amounts referenced in" its damage claims stated in the pretrial order (ECF# 117, p. 7), as here

quoted, "Unpaid contract sums totaling $498,093.46 in labor, equipment and materials provided to Tenawa, representing amounts set forth in delivery tickets and invoices that were reviewed and approved by Tenawa yet remain unpaid." ECF# 95, p. 16. PSI denies that it must describe the UEQM damage claims in detail and, if it does, then it asks the court in a footnote for leave to amend the pretrial order. ECF# 117, p. 8. Having questioned the nature, extent and scope of their contractual agreement with Tenawa, PSI regards itself entitled to bring an alternative UEQM claim. Believing it has come forward with genuine issues of material fact over the "reasonable value" of its work on the Interconnect Facility, PSI asks the court to deny summary judgment.

The court finds no legal basis behind PSI justifying expansion of its UEQM claim to unbilled work based on Tenawa's newer defense that PSI billed at excessive rates. While PSI may feel justified in waiting to do so, this does not bear on the issues to be decided. The circumstances do not justify PSI's delay or its failure to allege any damages corresponding to this claim. Tenawa paints the situation persuasively:

> [T]o date, PSI has never identified the specific damages it is claiming related to this unbilled work. Tenawa never identified these alleged damages in its two Complaints, in its initial disclosures, in its interrogatory answers, in a deposition, or in the Pretrial Order itself. Tenawa has nowhere to go to find out how much in damages PSI seeks for this claim. As mentioned in the introduction above, PSI honestly has no idea whether PSI is seeking $1,000 in damages related to this allegedly unbilled work or $1,000,000 in damages.

ECF# 125, p. 6. PSI does not effectively dispute this summary. While PSI is right that the actual amount of UEQM damages would be a question of fact for the jury, this assumes PSI has alleged some amount of damages and given the other side the opportunity to discover PSI's evidence of recoverable damages. Because this UEQM claim for unbilled work was not raised until the pretrial order, if there are no damages corresponding to this claim alleged in the pretrial order, then the plaintiff's UEQM claim is lacking an essential element: damages.

The court does accept PSI's position that these damages for unbilled work were alleged and disclosed as part of its "unpaid contract sums totaling $498,093.46" in the pretrial order. ECF# 95, p. 16. PSI described this damage total as the "labor, equipment and materials provided to Tenawa, representing amounts set forth in delivery tickets and invoices that were reviewed and approved by Tenawa yet remain unpaid." ECF# 95, p. 16. PSI clearly describes this damage total as representing only the work it invoiced to Tenawa. Because PSI was substantially specific in describing its damage claim in the pretrial order, the court is not inclined to indulge PSI with an exceedingly liberal construction. *See Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1220 (10th Cir.), *cert. denied*, 531 U.S. 926 (2000). PSI's expansive reading of its damage claim is directly contradicted by the plain language of the pretrial order. The court also finds it quite noticeable that PSI has yet to assert what amount of total damages represents the

reasonable value of its work covered by the UEQM claim. Having failed to allege a damage element to its UEQM, PSI's claim cannot withstand summary judgment.

In a two-sentence footnote, PSI "moves to amend the Pretrial Order to include a specific reference to quantum meruit damages, in an amount to be determined by the jury." ECF# 117, p. 8. PSI only refers to the need "to avoid manifest injustice." *Id*. The PSI's request triggers these standards:

> A pretrial order, which measures the dimensions of the lawsuit, both in the trial court and on appeal, may be modified "only to prevent manifest injustice." Fed.R.Civ.P. 16(e). *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir.1997). The party moving to amend the order bears the burden to prove the manifest injustice that would otherwise occur. *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir.2000). The purpose of the pretrial order is to "insure the economical and efficient trial of every case on its merits without chance or surprise." *See Hull v. Chevron U.S.A., Inc.*, 812 F.2d 584, 588 (10th Cir.1987). Because the issues and defenses of the lawsuit are defined by the terms of the order, "total inflexibility is undesirable." *Id*.

*Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1208 (10th Cir. 2002). The following factors are part of the relevant considerations: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption by inclusion of the new issue; and (4) bad faith by the party seeking to modify the order." *Id*. (quoting Koch, 203 F.3d at 1222). Adding this damage claim would prejudice Tenawa which has not had an opportunity to conduct discovery on this damage theory. Tenawa says it has "no idea" about when PSI did this work, what number of hours

are involved, what work was exactly done, who witnessed this work, and what amount of damages are claimed. The court finds the amendment would seriously and unfairly prejudice Tenawa and require re-opening the discovery to involve potentially several witnesses. PSI's request to amend the pretrial order is denied. Tenawa's motion for summary judgment on PSI's UEQM claim is granted.

**PSI'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACTS (ECF# 103) and TENAWA'S MOTION FOR PARTIAL SUMMARY JUDGMENT TO ENFORCE PLAINTIFF'S PUBLISHED PRICE LIST (ECF# 110) and TENAWA'S MOTION TO STRIKE THE AUGUST 2O14 PRICE LIST, FOR LEAVE TO FILE SUR-REPLY, FOR ATTORNEYS' FEES AND FOR OTHER RELIEF DUE TO PSI'S UNTIMELY PRODUCTION OF PRICE LIST (ECF# 130)**

Both sides seek summary judgment on what effect, if any, PSI's 2013 published price list has upon PSI's billing of services during the Project. PSI seeks summary judgment against Tenawa's affirmative defense that PSI overcharged in using rates higher than those published in the 2013 price list. PSI contends its charges were consistent with the July 2014 updated cost estimate which used its current price rates and was incorporated into the MSA "under the express terms of Exhibit I." ECF# 104, p. 2. PSI asks for a partial summary judgment finding, "that the rates quoted in 2013 were superseded by the July 2014 quote and that its work was performed on a cost-plus basis governed by 2014 price rates." *Id*.

In its summary judgment motion, Tenawa asks the court to enforce PSI's 2013 published price list as the MSA's governing schedule of

rates was never properly modified, superseded, or replaced. PSI never gave proper written notice to Tenawa of a rate increase, and Tenawa never gave its written approval to a rate increase. Tenawa asks the court to apply the 2013 price list and reduce PSI's claimed damages by $244,096.16.

Tenawa also moves to strike PSI's published price list dated "8-1-2014" that first appeared in this case as an attachment to PSI's reply brief. ECF# 128-3. Tenawa had been arguing for summary judgment in part on the fact that PSI's 2013 price list was the only rate schedule exchanged between the parties, was the only rate schedule found in the court's record, and so, was the only rate schedule that governed the parties' contract. Besides moving to strike this attachment from PSI's reply brief, Tenawa asks for various relief due to PSI's delayed presentation of this 2014 price list.

The following facts are particularly relevant to the issues argued in these three motions. On December 7, 2013, at Mr. Ameringer's request for Tenawa, Mr. Bergeron for PSI sent a cover letter which referred to "the original price of $4,760,000 dated September 13, 2013 . . . [as being] a preliminary budgetary quote based on the information provided by Tenawa and work performed on similar projects." ECF# 101-1, p. 8. This letter also said, that PSI's work would be "based on a cost-plus basis" and "attached a price list." *Id.* This attachment was entitled PSI's "published price list," and it bore the date of "2-1-13." *Id.* at p. 9.

On December 13, 2013, Mr. Ameringer included PSI's cover letter, budgetary quote and the 2013 price list with the MSA and purchase order which he signed and emailed to PSI. This purchase order, No. HAV-121313-002, stated a price of $4.76 million, and it described PSI's work as "Cost Plus Proposal for Haven Instrumentation and Electrical Engineering per Panel Specialist Cover Letter and Earlier Budgetary Estimate date 12/7/13." ECF# 101-1, p. 10. Mr. Bergeron signed the MSA for PSI on December 13, 2013. This purchase order provided as its "Terms" the following, "Per Periodic Billings based on equipment/supplies purchased and manpower hours." ECF# 104-1, p. 11.

In her deposition, Mrs. Bergeron initially said the 2013 published price list governed PSI's charges on the Tenawa project, ECF# 111-3, p. 5, but later described it as "a standard published price list. It's not written in stone," *Id.* at p. 8. In his deposition, when asked about the method and time of payment provisions in the MSA, Mr. Bergeron testified that PSI's 2013 published price list was the rate sheet "in force" when it was provided. ECF# 111-2, p. 15. He also testified that he was not aware of any "succeeding rate sheet approved in writing by Tenawa." *Id.* As for whether this price list was followed on the Tenawa project, Mr. Bergeron testified, "somewhat," explaining that, "[s]ome things we tried to follow as much as we possibly could, but not everything. There were certain things and certain instances that were handled on a case-by-case basis." *Id.* at p. 4. As for telling

Tenawa of these deviations, Mr. Bergeron testified that other than in the invoices, PSI did not tell Tenawa that the charges were deviations, and Tenawa did not ask about them. *Id.* at p. 5.

On July 3, 2014, Mr. Ameringer emailed Mr. Bergeron, "Per our conversation, attached is the Initial Cost Estimate to be updated. Thanks and Have a Great 4th." ECF# 104-1, p. 12. The email describes the attachment as, "Panel IC Est-9-19-12.pdf." *Id.* Mr. Bergeron responded by email two weeks later, the morning of July 17, 2014, with, "Please review the attached update and call me if you have any questions." *Id.* The email describes this attachment as, "Panel_Scope_Haven_estimate _33.xis." *Id.* at pp. 12-13. The attachment is a single page containing ten separate general job descriptions with a corresponding updated estimate. PSI's panel scope estimate in July of 2014 was "6,685,000" exceeding the December 2013 estimate by over $1.9 million. *Id.* at p. 14. The estimate does not disclose the estimated number of hours or the governing hourly rates and equipment prices for the ten listed jobs comprising the Project. On the afternoon of July 17, 2014, Mr. Ameringer replied, "Looks good. See you next week." *Id.* at p. 13. The parties did not issue a new purchase order from this updated estimate. PSI's work at the Plant site did not begin until later in July. Prior to this updated estimate, PSI had submitted at least nine invoices for labor and travel.  This estimate update did not include PSI's work done on the Interconnect Facility.

Mr. Bergeron avers that the July 2014 estimate "was based on then existing prices for labor, materials and equipment," that the 2013 published price list "was not in force in July of 2014," and that the "July 2014 estimate was an update to the December 2013 scope of work and superseded all prior pricing." ECF# 104-1, pp. 2-3. In contrast, Mr. Ameringer avers that, "[a]t no time prior to the filing of this lawsuit was Tenawa advised by anyone at PSI (i) that PSI's Published Price was no longer in effect with respect to the Tenawa project; (ii) that PSI had issued a new price list; or (iii) that PSI otherwise increased its rates from the Published Price List." ECF# 121-3, p. 4. Mr. Ameringer also notes he "did not agree to any amendment of the MSA or replacement or substitution of PSI's Published Price List or the rates included therein, because PSI never conveyed to me that its hourly rates had changed or were changing at any point before or during the Project." ECF# 121-3, p. 5. Mr. Ameringer also avers:

> 12. PSI and Tenawa never amended the MSA in writing signed by both parties in order to amend and/or remove the contractual terms of the MSA, Purchase Order, Budgetary Estimate Letter, or Published Price List.
> 13. PSI never, either orally or in writing, provided Tenawa with thirty (30) days' notice of a proposed rate change in excess of or different than the rates identified in the Published Price List, and also never sought or received Tenawa's written approval to any rate change during the project.

ECF# 111-1, p. 3.

The MSA also provides that a Contractor is to submit invoices for work done detailing "the rates applicable to each item in accordance with the schedule of rates furnished by Contractor." ECF# 104-1, p. 18. PSI posits that its delivery tickets complied insofar as the labor rates, per diems and lodging costs were plainly disclosed and that Tenawa reviewed and approved them. On behalf of PSI, Mr. Bergeron avers that PSI furnished delivery tickets "for all labor and services provided" which clearly set out the labor rates and per diems and that no Tenawa representative prior to this lawsuit notified PSI of a disagreement with the per diem and labor rates disclosed in the delivery tickets and invoices. ECF# 118-1, ¶¶ 17, 18 and 24. Mr. Bergeron further avers that in August of 2015 when Mr. Ameringer met with him about Tenawa's failure to pay every PSI invoice, Tenawa's non-payment notice did not contest the rates that PSI charged for labor rate or per diems even though they were based on PSI's July 2014 estimate and rates.

Tenawa reads the MSA as not requiring its immediate objection to delivery tickets and invoices prior to payment, but as reserving Tenawa's right to conduct a timely audit of paid invoices. Paragraph 11 of the MSA provides, in pertinent part:

> If Company compensates Contractor for work or services performed on a "cost plus" . . . basis, . . ., Contractor shall maintain adequate books and records satisfactory to Company in connection therewith and retain same for two (2) years from and after the year of completion of such work or services for the purpose of allowing Company to verify the accuracy of invoices presented by Contractor hereunder. Upon completion of the audit, Contractor shall refund to Company the

amount by which the total payments to Contractor exceeded the actual payments due as established by the audit.

ECF# 104-1, p. 21. PSI reads this provision as not giving Tenawa the right to audit "delivery tickets for agreed labor, materials and charges" but only to "verify[. . .] that the PSI Invoices match the approved Delivery Tickets." ECF# 128, pp. 5-6.

PSI argues that its delivery tickets as "approved constitutes an offer and acceptance by Tenawa of the labor, materials and other charges listed by PSI." *Id.* at 6. Tenawa offers the testimony of its Plant Manager, Bill Parkhurst, who reviewed PSI's Delivery Tickets and invoices at Mr. Ameringer's request. Mr. Parkhust testified he did not know of any agreement over hourly rates and had not seen PSI's published price list. Finally, Tenawa denies that any representative's signature showing receipt of a ticket or invoice constitutes an agreement to change the rate schedule. Brad Misley, Vice President of Operations at Tenawa, avers, "It was not until Tenawa was analyzing PSI's invoices during discovery in this case that Tenawa even realized that PSI increased the hourly rates for the job titles of PLC Programmer and PLC Technician in the middle of the Project." ECF# 121-5, p. 3.

Concerning PSI's failure to produce the 2014 price list during discovery, the following relevant facts are uncontroverted:

17.  In Requests No. 10 from Tenawa's First Requests for Production of Docements to PSI, Tenawa specifically requested that PSI produce all bids, price lists, estimates, costs of completion, quotes for work,

purchase orders, and supporting documentation created by PSI which relate in any way to the design, construction, operation, maintenance, and /or repair of the Plant. . . .

18.  In its Response to Tenawa's First Request for Production of Documents, PSI objected that it did not design, operate, maintain, or repair the Plaint and instead only constructed it, but then stated that it would produce the requested documentation related to its scope of work in response to Request No. 10. . . .

19.  To date (during the Project, discovery in this case, and summary judgment briefing), PSI has failed to produce or otherwise provide to Tenawa an updated or revised Published Price List or any other documentation showing its allegedly updated and increased hourly rates for 2014 or 2015, despite the fact that this documentation is directly responsive to Request No. 10 above, along with Request Nos. 12, 14, 17, 26, 36, and 38 from Tenawa's First Request for Production of Documents, to name a few others.

ECF# 121, pp. 13-14. As to ¶ 19, PSI has added that its "counsel was under the impression that the 2014 Price List had been produced within PSI's supplement production" and that PSI's 2014 Price List was now attached as Exhibit 3. ECF# 128, p. 7. PSI's attachment of the 2014 Price List as Exhibit 3 triggered Tenawa's motion to strike (ECF# 130) which the court takes up first.

Tenawa's Motion to Strike 2014 Price List and For Other Relief

Tenawa asks the court to strike the 2014 price list from the summary judgment record, to grant it leave to file a sur-reply, to order PSI to pay its attorneys' fees for filing this motion and the sur-reply, to instruct the jury at trial that PSI did not produce this 2014 price list until now, and to preclude PSI from discussing information related to the 2014 price list except for what is stated on its face. In lieu of the latter two requests,

Tenawa asks the court to preclude PSI from referencing or introducing the 2014 price list at trial.

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Tenth Circuit has recognized:

> "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir.1996). A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir.1998). Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *See Newman v. GHS Osteopathic Inc.*, 60 F.3d 153 (3d Cir.1995) (quoting *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir.1995)); *Cf. $9,041,598.68*, 163 F.3d at 252 (enumerating a similar list of factors to determine whether inclusion of last-minute evidence is harmless); *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir.1980) (applying these four factors to determine whether the district court abused its discretion in allowing testimony not specified in the pretrial order).

*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). "[A]lthough a district court need not mechanically recite the terms 'substantial justification' or 'harmlessness,' the district court's ultimate reasoning *should* reveal consideration of the *Woodworker's* criteria."

*HCG Platinum, LLC v Preferred Product Placement Corporation*, 873 F.3d 1191, 1201 (10th Cir. 2017) (citation omitted).

While admitting it never produced the August 2014 price list during discovery, PSI argues substantial justification from having never contended "that the August 2014 Price List was ever provided to Tenawa during the Project or was **the** price list used for all of the work on this Plant." ECF# 132, p. 6. This argument, however, does not warrant a narrow reading of Tenawa's broad discovery request for, "bids, price lists, estimates, . . . purchase orders, and supporting documentation created by PSI which relate in any way to the . . . construction . . . of Plant." ECF# 121-4, p. 5. PSI's 2014 price list squarely falls within the plain terms of Tenawa's discovery request. PSI created the 2014 price list. Insofar as the list either represents or is linked to the rates that PSI charged on the Project, then it is "related" to the Plant's construction. Indeed, PSI's summary judgment position is that it used the "current" 2014 rates to bill Tenawa. The court finds that PSI's 2014 published price list falls within the plain terms of Tenawa's discovery request and was subject to timely supplementation.

The 2014 price list certainly bears on the summary judgment decision whether PSI's 2013 schedule or its 2014 rates govern. PSI contends the 2013 published price list was superseded by PSI's July 2014 updated estimate. ECF# 118, p. 3, ¶ 15. And, PSI explains that its July 2014 estimate "was based on **PSI's 2014 rates**, not the rates in the 2013

Published Price List." ECF# 118, p. 16 (bolding added). This necessarily triggers consideration of any documentary evidence proving or disproving that PSI's price list in 2014 was higher. While PSI can prove its 2014 rates were higher without an actual published price list, Tenawa certainly is justified in seeking all evidence on what PSI's "2014 rates" were in July 2014 and on how PSI maintained and documented these higher rates. PSI's focus on its delivery tickets and invoices does not diminish Tenawa's reasonable request to look for other evidence.

PSI's explanation that it mistakenly believed the 2014 price list had been produced is not substantial justification. PSI admits the issue of price lists was the "subject of discussion" in December of 2017 during the formulation of the pretrial order. ECF# 132, p. 7. Though the court has not been given cause for questioning PSI's good faith, there is certainly a lack of diligence on PSI's part in not supplementing discovery promptly after receiving Tenawa's summary judgment arguments. It is troubling that PSI waited over three weeks and produced the price list on the same day it filed the final reply brief in the summary judgment proceedings. (ECF# 128).

Prejudice to Tenawa comes from not conducting discovery on the 2014 price list and from missing out on the chance to address this evidence in the summary judgment proceedings. PSI denies prejudice to Tenawa saying it should have expected PSI's annual rate changes and conducted discovery on the same. Tenawa's production request, however, was a

reasonable attempt at this very discovery. With discovery and summary judgment briefing effectively closed, curing this prejudice is complicated. Tenawa rightly argues prejudice from being denied timely discovery on this document including a forensic examination of metadata. The prejudice to the summary judgment proceedings is not relieved by now reopening discovery.

The court grants Tenawa's motion to strike the 2014 published price list from the summary judgment record and grants its request for reasonable attorneys' fees for briefing its motion to strike. The court postpones the calculation and award of these fees to the close of this litigation. Upon the striking of this summary judgment exhibit, Tenawa accepts that its motion for leave to file sur-reply is moot. ECF# 133, pp. 2-3. The court reserves for the trial judge's ruling Tenawa's other requests concerning the 2014 published price list's admissibility and/or restrictions of related evidence.

Summary Judgment Motions

As laid out above, both sides seek summary judgment as to the purpose, force, and effect of PSI's 2013 published price list that accompanied the MSA. The following general law governs the court's analysis. At ¶ 19, the MSA provides that the parties' "rights and obligations" under it "shall be construed and governed in accordance with" Texas law. ECF# 104-1, p. 22. "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not

ambiguous and the court will construe the contract as a matter of law."

*Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Not unlike the laws of

other states, Texas law provides:

> Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *National Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *CBI*, 907 S.W.2d at 520; *Coker*, 650 S.W.2d at 393; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent. *Daniel*, 243 S.W.2d at 157; *see also generally CBI*, 907 S.W.2d at 520.
>
> An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex.1981). For an ambiguity to exist, both interpretations must be reasonable. *See CBI*, 907 S.W.2d at 520; *see also Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex.1977). In this case, we must decide whether there is more than one reasonable interpretation of this contract such that a fact issue was created concerning the parties' intent.

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587,

589 (Tex. 1996). Neither side argues ambiguity but certainty in the MSA's

terms on which they respectively rely.

Tenawa argues for summary judgment that the PSI's 2013

published price list is the agreed rate schedule under the MSA and that this

rate schedule should control the applicable charges by PSI throughout the

Project absent a schedule change approved pursuant to the MSA. The

original purchase order incorporates the budgetary estimate, and the

budgetary estimate references and attaches the 2013 price list. Mr. Ameringer avers that he asked PSI in July of 2014 for an updated estimate so that he would have the most current estimates for upcoming meetings over the latest developments with the Project. Mr. Ameringer denies that his request for an update included or mentioned any amendment, supplementation, substitution, or superseding replacement of any contractual term concerning the MSA. He further denies that his reply, "looks good" to PSI's 2014 estimate, was intended or understood to be an agreement to replace or substitute PSI's 2013 schedule of rates. Because it never received nor discussed a PSI 2014 price list, Tenawa contends no such list could become operative under the MSA's terms. Finally, Tenawa says it did not realize that PSI's rates had increased until it analyzed PSI's invoices during discovery in this case. There is nothing of record showing that PSI attempted to follow the MSA in amending or replacing a schedule of rates. As an affirmative defense, Tenawa alleges PSI breached the MSA in billing PSI's labor and per diem charges on the Project at rates exceeding the 2013 rate schedule.

In arguing its side in these summary judgment proceedings, PSI first wants to narrow the MSA's contractual force, as only contemplating subsequent work orders and as deferring to the terms and prices of those later work orders. In that vein, PSI wants the court to construe the MSA as treating the 2013 budgetary estimate and accompanying 2013 Published

Price List as no more than a preliminary bid under Exhibit I superseded by PSI's updated July 2014 bid that was based on its 2014 rates. PSI would have the court interpret the July 2014 updated estimate as supplementing the MSA because the updated estimate came at Tenawa's request and served as the cost plus basis for the rates charged. PSI believes Exhibit I compels the same result in providing that, "if a particular work order is bid, the bid price will become the basis for Contractor's compensation." ECF# 104-1, p. 30. PSI also asks the court to interpret the December 2013 purchase order as being no more than a preliminary purchase order and as having no express rate schedule. PSI challenges that Mr. Ameringer's testimony on his understanding of the 2013 published price list is subject to a credibility attack in that he asked for and approved PSI's 2014 updated estimate and he also reviewed and approved PSI's delivery tickets and invoices. PSI posits that its disclosure of higher rates in the delivery tickets constituted written notice that it would be invoicing for those rates and that Tenawa was obligated to object at that point. PSI alternatively argues that the presentation, processing and payment of these delivery tickets and invoices constitutes offer and acceptance of a "subsequent, superseding agreement on rates." ECF# 118, p. 22. Finally, PSI argues against Tenawa's motion asserting waiver and estoppel based on Tenawa's review of the delivery tickets, approval and payment of the invoices, and October 2015 payment of PSI invoices.

After carefully reviewing the depositions and affidavits of the key representatives for both PSI and Tenawa, the court is left with the impression that genuine issues of material fact preclude summary judgment for both sides. None of the documents prepared and signed in December of 2013 specifically refer to PSI's 2013 published price list as a "schedule of rates." And while the Bergerons' testimony certainly supports a finding that they believed the price list was controlling when the MSA was executed, there is a question of material fact over whether there was an agreement that this published price list would constitute a schedule of rates for the life of the Project. The parties' performance under the MSA does not definitively point to a shared understanding about the intended purpose and effect of the 2013 published price list. There is no direct evidence from 2013 or 2014 that they discussed and reached an understanding about this published price list constituting a schedule of rates binding under the MSA and subject to its Section Six provisions on Method and Time of Payment. At best, there are only arguable and competing inferences to be drawn from the ticketing, invoicing, reviewing and approving of tickets without objection, and auditing rights under the MSA.

The parties' purchase order in December of 2013 merely grouped together all of PSI's 2013 submissions, including the price list, and referred to them as the, "Earlier Budgetary Estimate dated 12/7/13." ECF# 104-1, p. 10. And before PSI began its actual construction work on the

Project site, Tenawa requested from PSI an updated estimate in July of 2014. PSI provided the updated estimate that increased the total cost of its work by more than 40%. Tenawa simply responded, "looks good." The parties' conduct does not reveal much of a shared understanding about the purpose and effect of these "estimates" and the documents submitted in support of them. The sides differ on whether PSI's original or updated submission is controlling, but they call both "estimates." Tenawa would have the original estimate be a "schedule," and PSI would have both estimates be no more than "bids." Because the MSA does not specifically address "estimates," because the parties genuinely dispute how their dealings were intended to be covered by the MSA, and because there are credibility issues raised as to the parties' testimony and affidavits on this issue, the court denies summary judgment for both sides.

**TENEWA'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S MECHANIC'S LIEN CLAIM (ECF #106)**.

In the pretrial order, PSI lists four legal claims, the last of which is: "Mechanics' Lien: PSI is also entitled to recovery on its mechanics lien filed in Reno County, KS on November 5, 2015." ECF# 95, p. 12. Tenawa includes in the pretrial order the following defense to this claim: "PSI's claim related to the mechanic's lien it filed is untimely and barred by the statute of limitations because the lien expired one year after it was filed pursuant to K.S.A. § 60-1105(a)." *Id*. at p. 13. The Kansas statute provides:

> (a) *Limitations*. An action to foreclose a lien under this article shall be brought within one year from the time of filing the lien statement, but if a promissory note has been attached to the lien statement in lieu of an itemized statement, the action shall be commenced within one year from the maturity of said note.

K.S.A. 60-1105(a). The question then is whether PSI's mechanic's lien claim is barred by this statute.

PSI filed its mechanic's liens in September and November of 2015 in Reno County, Kansas. PSI attached no promissory notes to the liens. When PSI originally filed this case on December 18, 2015, in the United States District Court for the Eastern District of Louisiana, it included no count seeking to foreclose on these mechanic's liens. ECF# 1. PSI's amended complaint filed two weeks later also lacked a claim to foreclose on the mechanic's lien. ECF# 5. Neither complaint even mentions the mechanic's liens. This case was then transferred to the District of Kansas in August of 2016. In the drafting of the pretrial order in January of 2018, PSI added the legal claim quoted above for recovery on its mechanic's lien. PSI has not filed a separate action seeking foreclosure of the mechanic's lien.

PSI adds that when Tenawa argued for transfer from Louisiana to Kansas it mentioned PSI's mechanic's liens and the requirement upon PSI to foreclose these liens in Reno County, Kansas. ECF# 7-1, p. 6. PSI also points to the corresponding amounts of loss alleged in its filed liens and in its filed court claims for recovery. PSI also highlights that it identified the mechanic's lien as a supporting document in discovery.

Tenawa argues PSI's mechanic's lien is unenforceable, because
PSI failed to file a lawsuit seeking foreclosure of its mechanic's lien within
one year of filing the lien statement. The Kansas Supreme Court has said
that Kansas "lien statutes [§ 1105(a)] have a specific period for
enforcement." *Boyce v. Knudson*, 219 Kan. 357, 362, 548 P.2d 712 (1976).
"When liens are not timely perfected pursuant to K.S.A. 60-1105(a), K.S.A.
60-1108 provides a statutory remedy." *Id.* Namely, "[i]f no action to
foreclose or adjudicate any lien filed under the provisions of this article shall
be instituted within the time provided in subsection (a) of K.S.A. 60-1105,
. . ., the lien shall be considered canceled by limitation of law." K.S.A. 60-
1108. In *Boyce*, the Kansas Supreme Court emphasized the following:

> In construing the mechanics' lien statutes in *Sutherland Lumber Co. v.
> Due*, 212 Kan. 658, 512 P.2d 525, the court held mechanics' liens are
> statutory in origin and one who claims the benefit of such a lien has
> the burden of bringing himself within the purview of the statutes which
> create them. Our prior mechanics' lien statutes have been so
> construed. (See, G.S.1949, 60-1405; L. 1909, ch. 182, s 653; May 29;
> R.S.1923, s 60-1405.) In *Clark Lumber Co. v. Passig*, 184 Kan. 667,
> 339 P.2d 280, the court stated:
>> 'Equitable considerations do not ordinarily give rise to a
>> mechanic's lien. (For an exception see the recent case of *Adair v.
>> Transcontinental Oil Co.*, 184 Kan. 454, 338 P.2d 79.) Being
>> created by statute, a mechanic's lien can only arise under the
>> circumstances and in the manner prescribed by the statute. It
>> has been said a lien claimant must secure a lien under the
>> statute or not at all. *Doane v. Bever*, 63 Kan. 458, 65 P. 693 . .
>> .' (p. 673, 339 P.2d p. 285.)
> In *Bell v. Hernandez*, 139 Kan. 216, 30 P.2d 1101, the court stated:
>> 'Mechanics' liens, rights acquired under them, and procedure to
>> obtain such rights, were unknown to the common law. . . . They
>> are conferred by statute alone, and one who obtains the benefit
>> of the statute must be within the purview of the statute and

> pursue his remedy in the manner and within the time prescribed by statute. . . .
>
> '. . . 'A mechanic's lien not foreclosed within the time allowed by statute, is no longer an enforceable lien.' *Montgomery County Nat. Bank v. Backus*, 108 Kan. 779, 196 Pac. 1074.' (pp. 218, 219, 30 P.2d pp. 1102, 1103.) (Emphasis added.)
>
> We think the conclusion is inescapable that the liens filed by the appellants herein lost their force by failure of the appellants to foreclose them within one year from the time of filing.

219 Kan. at 362. Under *Boyce*, it falls to PSI in seeking the benefits of this statutory remedy to bear the burden of satisfying the statutory requirements, which include foreclosing on the lien within the one-year period, or the lien will not be enforceable.

PSI asks that its current lawsuit be treated as an action seeking to enforce its mechanic lien. PSI argues "the parties have always treated the Lawsuit as a means by which to adjudicate the amounts owing or potentially owing to PSI as described in the Statement of Lien filed in Reno County, Kansas." ECF# 116, p. 3. PSI notes that Tenawa realized from the beginning of the suit that PSI's filed lien corresponded in amount to the damages sought in its complaints and that Tenawa knew PSI's lien existed for its protection. PSI does not come forward with any authority for holding that this statutory requirement of filing an action can be satisfied on the equitable consideration that the defendant should have known. As the Kansas Supreme Court said in *Boyce*, equitable considerations do "not toll the one-year statute of limitations for foreclosure of mechanics' liens." 219 Kan. at 363 (citing *Bell v. Hernandez*).

PSI further argues that its original and amended complaints are enough on their own because, "[u]nder K.S.A. 60-1105(a), the lienholder must simply take some affirmative action on its own behalf to foreclose its lien. *See Columbia Sav. Ass'n, F.A. v. McPheeters*, 21 Kan. App. 2d 919, 923, 911 P.2d 187, 191 (1996)." The court, however, concludes that PSI's complaint and amended complaint never affirmatively asserted a right to have its lien adjudicated or foreclosed upon. *See, e.g., Diehl v. Lumber Transp. Inc. v. Mickelson*, 802 P.2d 739, 743 (Utah Ct. App. 1990) (while defendant answered and counterclaimed that it had not been paid, it "did not seek nor claim a right to foreclosure of any lien" until its amended counterclaim); *Miller v. T.A. & J.M. General Contractors, Inc.*, 124 Misc. 2d 273, 274, 476 N.Y.S.2d 449 (1984) (no action to enforce lien was commenced by filing a contract action seeking damages for unpaid balances without mentioning the lien). As Tenawa notes, PSI did not affirmatively allege and act on its lien interest until it asserted this mechanic's lien claim in the pretrial order over two years after filing its lien. That the amount of the liens filed in Reno County, Kansas, match the amount of damages claimed in the lawsuit simply is not the same as asserting a lien interest and affirmatively asking for it to be adjudicated.

Relying again on the common claimed amount of damages and on other non-pleading references to the mechanic's lien, PSI advocates for relation back using Rule 15's analysis for an amended pleading. The court

concludes relation back is unavailable to PSI in these circumstances. When PSI sought to add this mechanic's lien claim through the pretrial order, the limitations period had already expired and, by statute, the lien had already been "cancelled." K.S.A. 60-1108. Consequently, there was no valid lien upon which to bring an action. *See United Pacific Ins. Co. v. Cottonwood Properties, Inc.*, 156 Ariz. 149, 150, 750 P.2d 907, 908 (1987) (relation back cannot revive an untimely statutory lien foreclosure action); *Diehl Lumber Transp. Inc. v. Mickelson*, 802 P.2d at 744 ("once the time had expired, the court lacked authority to revive the lien by permitting amendment under Rule 15,"); *Boyce*, 219 Kan. 364 ("When those liens were not timely determined, they were no longer enforceable . . . ."). Based on the Kansas statute and the Kansas Supreme Court's strict reading of this statutory remedy, the court believes the Kansas Supreme Court would not allow a cancelled and unenforceable lien to be revived by relation back. Even assuming Kansas Supreme Court would do otherwise, the court does not find relation back is justified here. The transactional circumstances unique to a mechanic's lien action are the requirements for a perfected or timely determined lien. PSI's complaints, however, never referred to the liens, never discussed the occurrence of their filing, and never addressed the other requirements for a valid and enforceable lien. Tenawa is entitled to partial summary judgment on PSI's mechanic's lien claim.

**TENAWA'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PSI'S CLAIMS FOR ATTORNEYS' FEES AND SUPER-INTEREST ECF# 108**

In the pretrial order, PSI does not include attorneys' fees and super-interest as one of its legal claims. But under the sectional heading of, "Damages and Non-Monetary Relief Requested," PSI "claims entitlement" to certain damages including, "(iv) Attorney's fees and costs, **as provided for in PSI's delivery tickets and invoices**; (v) Penalties under applicable statutes . . . ." ECF# 95, p. 16 (bolding added). Tenawa seeks partial summary arguing PSI is not entitled to recover as there was no agreement or acceptance of those provisions in the delivery tickets and invoices. In emailing its tickets and invoices, PSI failed to email the Terms and Conditions page that included the fees and super-interest provision. Tenawa also argues PSI is not entitled to recover attorney's fees against a limited liability company like Tenawa under Texas law.

In response, PSI withdraws its contractual claims for attorneys' fees and super-interest based on the Terms and Conditions found on the back of its delivery tickets. PSI, however, says it "is still seeking its attorney's fees and interest pursuant to Texas law," and maintains it has a claim for fees and interest claim under Texas law. ECF# 120, pp. 1-2. PSI believes this claim is included in the pretrial order, because it has listed "penalties under applicable statutes" as one of its damage elements and because Tenawa has set out defenses under Texas law to fees and interest. (ECF# 95, p. 12, ¶ 4(b)(iii) and p. 16, ¶ 5(a)(v).

In reply, Tenawa explains its motion does not address PSI's statutory claim for pre-judgment interest but only PSI's claim for super-interest which PSI has now withdrawn. Tenawa denies that PSI has asserted in the pretrial order any Texas statutory claim for attorney fees and that Texas case law forecloses recovery of fees against a limited liability company, like Tenawa.

On its face, the pretrial order shows PSI's claim for attorneys' fees was exclusively contractual in nature. PSI included no reference to a statutory basis for its attorney's fees claim. The court cannot stretch the vague reference to "penalties under applicable statutes" to include a statutory claim for reasonable attorney's fees particularly when PSI chose to affirmatively assert a claim for attorneys' fee citing only a contractual basis for recovery.

Even if PSI had included a statutory claim for fees, this court would find that PSI cannot recover fees against Tenawa, a limited liability company, under § 38.001. The persuasive weight of judicial opinions have interpreted this statute as not allowing this recovery:

> Section 38.001 of the Texas Civil Practice and Remedies Code authorizes an award of attorneys' fees for certain enumerated classes of claims brought by a "person" against "an individual or corporation." See Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2015); *Choice! [Power, L.P. v. Feeley*, No. 01-15-00821-CV], 2016 WL 4151041, at *8 [(Tex. App.—Houston [1st Dist.] Aug. 4, 2016, no pet h.)]. Under the plain language of section 38.001, a trial court cannot order limited liability partnerships (L.L.P.), limited liability companies (L.L.C.), or limited partnerships (L.P.) to pay attorneys' fees. *See Choice!*, 2016 WL 4151041, at *11 (section 38.001 does not permit recovery against

an L.P.); *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 452–55 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (section 38.001 does not permit recovery against an L.L.C.). The availability of attorneys' fees under a particular statute is a question of law for the court. *See Fleming & Assocs., L.L.P. v. Barton*, 425 S.W.3d 560, 574 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

*Phoneternet, LLC v. Drawbridge Design*, 05-17-00890-CV, 2018 WL 3238001, at *2 (Tex. App.--Dallas July 3, 2018). While these decisions are still not the final word on interpreting § 38.001, federal district courts in Texas certainly have accorded them some precedential weight:

> Texas law authorizes a party to collect attorneys' fees in some types of actions—but only from an individual or a corporation. Tex. Civ. Prac. & Rem. Code § 38.001. Section 38.001 does not authorize a party to collect attorneys' fees from a limited liability company. *PEG Bandwidth TX, LLC v. Texhoma Fiber, LLC*, 299 F. Supp. 3d 836, 848 (E.D. Tex. 2018). Because Stabilis is a limited liability company, Compass cannot collect attorneys' fees from Stabilis.

*Stabilis Fund II, LLC v. Compass Bank*, 3:18-CV-283-B, 2018 WL 3617971, at *3 (N.D. Tex. July 30, 2018); *Nerium SkinCare, Inc. v. Nerium Intl., LLC*, 3:16-CV-1217-B, 2018 WL 2323243, at *6 (N.D. Tex. Mar. 26, 2018) ("Every federal and state court to consider this issue, including at least four judges in this district, has determined that section 38.001 does not apply to unincorporated entities." (citations omitted)), *report and recommendation adopted*, 3:16-CV-1217-B, 2018 WL 2323471 (N.D. Tex. May 2, 2018). The court agrees with Judge Marten's prediction that the Texas Supreme would follow these lower courts in interpreting § 38.001 as not including an LLC:

> Where the Texas Supreme Court has not weighed in on an issue—and it has not in this instance—the court must predict how that court would rule. It does so by considering all available resources, including

decisions by Texas and federal courts, any other relevant decisions, and the general weight and trend of authority. Cornhusker Cas. Co. v. Skaj, 786 F.3d 842, 852 (10th Cir. 2015). The statute at issue allows a person to recover an attorney's fee "from an individual or corporation." Texas state and federal courts "have narrowly construed this provision to limit recovery of attorney's fees to individuals and corporations but not other legal entities, such as limited liability companies or partnerships." J.D. Fields & Co., Inc. v. North Am. Fabricators, LLC, 2016 WL 7912455, *14 (S.D. Tex. Nov. 7, 2016). The only courts to have squarely considered whether the provision allows an award of attorney's fees against an LLC or similar entity have concluded that it does not. [citations omitted]

. . . As indicated above, the courts that have addressed the issue have found that the statute does not permit an award of attorney fees to an LLC. Given the significant weight of authority indicated above— and the plain language of the statute—the court must predict that the Texas Supreme Court would conclude that an LLC is not an "individual or corporation" within the meaning of § 38.001.

*Violetta v. Steven Brothers Sports Management, LLC*, 2017 WL 1197662, at *2-*3 (D. Kan. Mar. 31, 2017). Finally, PSI asks the court to determine whether Tenawa can be a "person" under § 38.001 and seek attorney's fees when it is not an "individual or corporation" under the same statute. PSI is not entitled to a decision on this issue, as it has not filed a motion seeking dispositive relief against Tenawa's attorneys' fees claim. The court, therefore, grants Tenawa's motion for partial summary judgment on PSI's claims for attorneys' fees and super-interest.

IT IS THEREFORE ORDERED that PSI's Motion for Partial Summary Judgment on Issue of Breach of Contract for Delay (ECF# 100) is denied, but Tenawa's counterclaim for breach of contract for delay is construed as seeking recovery and relief exclusively under the limited terms of MSA's ¶ 10;

IT IS FURTHER ORDERED that Tenawa's Motion for Summary Judgment on PSI's Unjust Enrichment/Quantum Meruit Claim for PSI's work that it never billed or invoiced Tenawa (ECF# 102) is granted;

IT IS FURTHER ORDERED that PSI's Motion for Partial Summary Judgment on Contracts (ECF# 103) and Tenawa's Motion for Partial Summary Judgment to Enforce Plaintiff's Published Price List (ECF# 110) are denied;

IT IS FURTHER ORDERED that Tenawa's Motion to Strike (ECF# 128) is granted to the extent indicated above;

IT IS FURTHER ORDERED that Tenawa's Motion for Partial Summary Judgment on Mechanic's Lien Claim (ECF# 106) is granted;

IT IS FURTHER ORDERED that Tenawa's Motion for Summary Judgment on Attorney's Fees and super-interest (ECF# 108) is granted.

Dated this 28th day of December, 2018 at Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge